## Richter's Estate.

*Irvin H. Campbell* and *Samuel G. Stern,* for accountant.
*Franklin L. Wright* and *Frank A. Moorshead,* contra.

HOLLAND, P. J., May 15, 1928.—Paul F. Richter died on Jan. 15, 1926, having made his last will and testament bearing date Jan. 31, 1923, duly probated Jan. 22, 1926, on which the present letters were granted to the accountant which was appointed sole executor, testamentary trustee and guardian of testator's minor son, Paul Berkley Richter.

At the time of his death, the testator was possessed of personal estate of the inventory value of $72,763.91. He also owned real estate, being the premises referred to in the will, No. 738 South Latches Lane, Merion, this county, which the executor sold and realized $34,065.31.

The account was filed May 7, 1927, showing the following balances for distribution: Principal of personal estate, $51,088.68, composed of the unconverted investment securities set forth on page 14 of the account carried at $59,019.33; inventory value of jewelry, $60.25, or an overdraft of principal of $7990.90; proceeds of real estate, $32,983.95, composed of purchase-money mortgage on No. 738 South Latches Lane, $21,000, and cash; and income $4472.06.

The claims of Dr. S. W. Sappington in the sum of $500, of Dr. Carroll H. Haines in the sum of $1250, of Dr. Edward G. Muhly in the sum of $550, and Dr. Leon T. Ashcraft in the sum of $2500, all for medical and surgical service to the decedent in his last illness, were presented at the audit. They were not admitted and proof was required. Testimony was taken in behalf of these claims.

The uncontradicted testimony seems to establish that decedent, at the inception of his last illness, consulted Dr. Haines. His advice was sought, not with the view of having him treat decedent, as he was a nose and throat specialist, but rather for guidance to those specialists within the purview of whose specialty the particular malady came with which decedent was then suffering. Dr. Haines had, some time previous to his last illness, operated upon and treated decedent for a nose and throat affliction, from which contact the acquaintance had sprung up between them. As was stated in the testimony, Dr. Haines was brought into the case more as a friend and guide than professionally, although it appears that he visited him and kept conversant with his condition.

Dr. Haines put him under the care of Dr. Ashcraft, who is a specialist in genito-urinary diseases and a surgeon. Decedent was taken to Hahnemann Hospital by Dr. Haines and the latter made all arrangements for his stay there. He was admitted to the hospital Dec. 16, 1925, and Dr. Ashcraft examined him Dec. 17, 1925. On the evening of Dec. 19, 1925, in the presence of Mildred K. Barber, the private nurse, Dr. Palen and Anna Johnson, another nurse, decedent expressed appreciation to Dr. Haines for his services and assured him he would pay him for his services, past and future. Decedent was operated upon on the night of Dec. 19, 1925, for the removal of a stone in the right kidney. The operation was performed by Dr. Ashcraft, assisted by Dr. Benson. Dr. Haines and Dr. Campbell were present, the latter also assisting.

Very soon after this operation the patient developed pneumonia and Dr. Muhly was called in Dec. 21, 1925, he being a diagnostician and a specialist in chest conditions. Some time after this operation, Dr. Sappington was called into consultation as to blood transfusion. He is the pathologist at Hahnemann Hospital, and has charge of the laboratory. He also is a specialist in blood transfusion. There were four blood transfusions given the patient by Dr. Sappington.

On Dec. 31, 1925, the patient's right kidney was removed. Dr. Ashcraft performed the operation, assisted by Dr. Benson. From Dec. 17, 1925, to Jan. 15, 1926, the date of decedent's death, Dr. Ashcraft made daily visits to see the patient, making two, three and even four visits on some days. Dr. Ashcraft occasionally dressed the wounds of the patient, but this was usually attended to by Dr. Benson. Dr. Haines treated the ears of the patient and

was in daily attendance, watching the chart and his general condition and keeping in touch with Dr. Ashcraft and the other physicians. Dr. Haines's charge is principally on account of loss caused by his absence from his office.

The charge made by Dr. Sappington is for the four blood transfusions, for vaccine injections, consulting visits every morning, taking blood counts and for laboratory tests. It does not include fees paid "donors" of blood, they having been paid by the hospital. He obtained the "donors," however.

It is admitted that all the claimants who actually furnished medical and surgical service are of the first rank in the profession in their respective specialties, that they rendered their services with the highest skill and employed the latest and best methods known in the art of medicine and surgery in the light of the degree of development to which that art has attained, and that they all labored heroically to save decedent's life.

It is admitted that claimants do not base their claims on any specific contract between themselves and decedent, but that the claim of each is in the nature of a *quantum meruit*. The question, therefore, is as to how much each deserves or merits for his respective services.

The claimants called other physicians and surgeons who were experts in the same profession and who testified that the respective claims were reasonable and fair. This evidence was competent. Persons engaged in the same line of work as a claimant may be called as an expert on questions relating to the value of such work and may state whether or not certain charges are reasonable: Thompson *v.* Boyle, 85 Pa. 477; Worden *v.* Connell, 196 Pa. 281; Walton's Estate, 16 Phila. 367. But, as was stated in Walton's Estate, *supra:* "The opinions of experts as to the value of the services need not be implicitly followed. While opinions of this character may aid, they cannot control in considering a claim."

Their opinions will be considered along with the other elements recognized in the law which determine the propriety of physicians' charges. We doubt, however, whether this opinion testimony is of much help to a court passing upon physicians' claims. Certainly, it is not as valuable as it would be in a case where the subject under consideration is a commodity or service having a recognizable current market value, such as merchandise or carpenter's wages. These witnesses may be quite truthful and sincere when they say that the charges made in this case were "fair and reasonable" or were the usual charges by men of the claimants' standing for the services rendered. But we know by the very nature of a physician's service that it is almost impossible to tell what is a usual or customary charge. Different charges are made by different physicians for the same service. Different charges are made by the same physician to different people according to their financial condition.

These witnesses express it as their opinion that under all the circumstances the charges are "fair and reasonable." But as to what is "fair and reasonable" is for the ultimate judgment of the court. Their opinion as witnesses cannot go beyond what the usual or customary charge is, and, as we have pointed out, though their testimony is not unreliable, it is not convincing, nor do we see that it aids us much.

The apparent truth is that there is no market or current value for medical or surgical services as there is for other services or for articles of property. We doubt indeed whether a physician's services can be measured on a monetary basis at all. If a skillful surgeon performs an operation and admittedly saves a human life, how can that service be gauged in money? If the man whose life was saved had a million dollars, it would not be too great a price for the saving of that which to him is priceless. Yet the dictates of good

sense tell us it would be unreasonable to award, and no surgeon would think of demanding, more than a relatively very small part of his million for even so great a service. On the other hand, if an equally skillful surgeon operates on a poor person and does not receive or even demand a cent, and there are thousands of such cases, it being of such common knowledge that we are bound to take judicial notice of it, does it mean that the service in saving the life of the less fortunate person is valueless? Who would brave the scorn of an enlightened age to answer in the affirmative?

Who can have the intuitive wisdom to put a price on human life, appraise the relief of human suffering, or estimate the reward for heroic rescue from the ravages of disease? Judge Ashman, in Mortimer's Estate, 13 Dist. R. 51, in arriving at the conclusion that a physician may fairly demand a maximum and a minimum rate of pay, just as the circumstances of his patient shall seem to indicate will be proper, says: "Where it (the service) saves a human life, its value is inestimable, for it is as true now as it was in the days of Job that a man will give all that he has for his life. With somewhat of unanimity the best rhetoricians from Isocrates to Ingersoll have agreed with the inspired patriarch that human life, whether of high or low degree, is equally sacred, and every sane man and every court in Christendom admits the truth of the proposition. No flight of rhetoric, however, can escape the plain fact that life has a pecuniary value of variable quantity, greater, for instance, in the case of the millionaire than in that of the day laborer. . . ."

While we agree with this conclusion, concerning which we will hereafter comment, we cannot agree with the theory upon which it was arrived at. The court in that case, it will be observed, based its decision upon the relative value of the service to a person of wealth and to a person of humble station.

It is true that it is a well-recognized principle of law that life and health in a sense have an ascertainable monetary value when the one is taken or the other is injured by a tortfeasor. In the one case it is a compensation to a person or persons designated in law for what they naturally would have received, owing to their relation to the decedent, had his life not been taken; in the other case, it is a compensation to him for what his natural powers and endowments would have earned for him had his health not been injured. In either case, it is the valuation, not of the life or health, but rather of the productivity of the life or health. We see a distinction between this and the attempt to value life or health itself on a monetary basis. This latter we hold to be an impossibility. We must seek other rules to determine the reasonableness of a physician's or surgeon's fee.

We recognize the principle in Mortimer's Estate, *supra*, to the effect that a physician or surgeon may charge different amounts for the same service, depending upon the relative circumstances of his patient, and must in every case give the best service he is capable of. Upon the same principle, where the claim is against the estate of a decedent for service rendered the decedent in his lifetime, the size of the estate may be considered in determining the reasonableness of the fee: McCann's Estate, 11 Dist. R. 244.

The decisive factor, therefore, is not the value of the service, but rather what the claimant deserves and what the patient or his estate ought to pay.

Through generations of development of the science of medicine and surgery and of the art of their practice, the law has come to recognize a special class of professionals whose gifts are to the race as a whole and whose benefactions are so vital that the lowly and the mighty, the rich and the poor, the intelligent and the ignorant, the cultured and the uncouth, are inherently entitled to them in equal degree.

Assuming, as we have above maintained, that these gifts and benefactions by their very nature cannot be valued upon a monetary basis, it follows that the race as a whole owes this class not only a decent living, but a living on a reasonably high plane. They necessarily are people of education and refinement and are entitled to an existence in keeping with the natural requirements as to environment and association of such a class. In distributing their maintenance, therefore, upon the race as a whole, those who can must pay, and in proportion to their substance. They have not the same opportunities as others of holding out for a price, nor dare they refuse even the penniless. Where others make discoveries of industrial processes or invent devices for human needs, they can have them patented and reap the exclusive benefits from them. But these scientists in many cases spend the energy of a lifetime in research and experimentation, seeking methods and devices to combat disease and suffering. When they make a discovery, after years of incessant and tireless labor, they do not secrete it, but, on the contrary, broadcast it to the world.

The rules, therefore, which a court must apply to ascertain whether in the first place a physician or surgeon is entitled to a fee, and in the second place the reasonable amount thereof, seem to be:

1. He must give the best service he is capable of.

2. The service must meet the usual standards in view of the degree of development that the science has attained at the time of rendering it.

3. How much does the claimant deserve, which depends upon *(a)* his standing in the profession; *(b)* the degree of difficulty of the service; *(c)* the quantity of the service; *(d)* the amount others of the same standing in the profession charge for the same service under similar circumstances.

4. What is the patient able to pay, or, if the claim is against an estate, what relative or proportionate amount should an estate of that particular size pay?

Applying these rules to Dr. Ashcraft's claim, we can pass the first and second with little comment. Certainly, he gave decedent his very best service and met all the standards of modern surgery. As to the third, the testimony shows, and there is no doubt, that he is an eminent surgeon and among those at the head of the profession. The removal of a stone in a kidney and the removal of a kidney are two of the most difficult operations in surgery and can only be attempted by an exceptional surgeon after years of training and experience. As to the quantity of the service, not only did he perform the operations, but was in daily attendance upon the patient, occasionally making visits consuming long periods of time. There is testimony that his charge is not unusual among other surgeons of equal standing for the same service under similar circumstances. The application of the fourth rule has given us the most difficulty.

We have heretofore indicated, a person who has no money, property or means gets the medical or surgical service without paying anything. If he is able to pay, though poor, he must pay what he can according to his means and considering the number of his dependents. If his life is saved by the treatment and his health restored, having paid what he could, after getting back to work, he is released to his labors to continue to maintain himself and his dependents. By the same rule, when one of his dependents receives the treatment, he must pay what he can. What such a person can pay is likely to be less than the minimum that the physician or surgeon deserves, as measured by the first three rules. If the amount that the person is able to pay for himself or his dependents is more than this minimum, he must pay the minimum,

plus the fair and reasonable amount that he should pay in proportion to his income or means.

When the claim is against a decedent's estate, the claimant is entitled to so much of the minimum fee that he deserves under the first three rules as the amount of the gross estate warrants, and if the gross estate is sufficiently large, he is entitled to this minimum, plus an amount in accordance with the size thereof. Where there is a substantial balance, this may also be taken into consideration in fixing the fee. We also hold that the court may consider the classes of beneficiaries entitled to the balance, their relation to the decedent, the degree in which they are dependent upon their inheritance, if natural dependents of decedent, and their financial responsibility.

The gross amount of this estate, consisting of $73,433.89 principal personalty and $34,065.31 proceeds of realty, as shown by the account, plus $5254.55 surcharges, is almost $113,000. The net amount of the estate, consisting of $51,088.68, balance principal personalty, $32,983.95, balance proceeds of real estate, as shown by the account, plus $5254.55 surcharges, less the claim of Albert O. Richter, which has been allowed, is about $87,000. Applying the fourth rule in connection with the other three rules, we are of the opinion that, considering the gross and net amounts of this estate, $2000 is a fair and reasonable fee for Dr. Ashcraft's services. We decline to allow interest upon it, however, as we have made this feature of the claim a substantive consideration, and, therefore, allow it in the sum of $2000 only, the principal amount thereof.

Applying these rules similarly to the claims of Dr. Sappington and Dr. Muhly, we are of the opinion that they should be allowed in full for $500 and $550, respectively, but without interest, for the same reason given in the consideration of Dr. Ashcraft's claim. These men are of high standing in their respective specialties, gave much time and close attention to the case, and Dr. Sappington's work was of a highly technical nature. The evidence seems to indicate that these claimants were brought into the case without first consulting the decedent, but it is apparent that at that time his condition was so desperate that he could not be consulted. Where a patient is unable to be consulted on account of mental condition or serious physical condition and some member of his family cannot be consulted in his place, the law implies an authority in the attendant physician to act on behalf of the patient according to the physician's best judgment, and if, under such circumstances, he engages the services of a consulting physician, the patient or his estate becomes liable to pay a reasonable sum for his service: Sherman's Estate, 19 Phila. 109.

The claim of Dr. Haines rests upon an entirely different basis from that of any one of the other three disputed claims. While he did do some work as a physician, such as watch the chart and the general condition of the patient and act as a co-ordinating agent among the other physicians and surgeons, it is admitted that he interested himself so closely in the case principally as a friend of the decedent. The fact that the patient was suffering from a kidney condition and its resulting complications, while Dr. Haines is a specialist on the ear, eye, nose and throat, demonstrates in itself the degree of his usefulness in the case as a physician.

According to Mildred K. Barber, the nurse, "he was there (at the hospital) every day and most all day, and at night." Dr. Muhly in his testimony speaks of relieving him on one or two occasions at night so that he could get some sleep. His vigil seems to have been incessant during the entire period of

decedent's illness of about a month. This, of course, interfered to some extent with his practice at his office.

This relation of friendship between the decedent and the claimant, as clearly proven by the claimant himself, would ordinarily tend to negative the implication that he should receive compensation for his service. It was held in Moffett's Estate, 11 Phila. 78, "where a physician attends his brother, such service as he renders on account of his special interest in the patient by virtue of his relation to him cannot be made the basis of pecuniary compensation. The most he is entitled to is for professional visits made and the number of operations performed by him at the usual rates." It was held in Walton's Estate, 16 Phila. 367, where the patient is related to the physician, it is a question of fact for the court as to which visits are professional and which on account of the relation. It was also held in Trites's Estate, 14 Phila. 248, that relationship is a strong fact as evidence that no fee was to be charged and very slight circumstances in addition thereto are required to repel the idea of obligation to pay.

We are of the opinion that the same principle applies, though in a less degree, where the relationship is that of friendship instead of that of blood.

But the evidence shows that the decedent desired his friend, the claimant, to manage the whole affair and to stay with him and see him through the ordeal. It also indicated that he wished and intended his gratitude to be expressed in pecuniary compensation. Mildred K. Barber testified that "he said he would leave everything to him. He wanted him to do everything that he thought fit and that he would make it right with him, fix it up with him when he got well."

The claimant should, therefore, be paid. This leads us to the question of the amount that should be allowed. One of the items of the claim is for $200, for attending the two operations. This must be stricken out at the outset. The claimant did nothing at either operation. Dr. Ashcraft was assisted by Dr. Benson and Dr. Campbell. This claimant was, at most, only an interested spectator. We are also of the opinion that the item of $150 for assisting at the blood transfusions is excessive and allow only $50 for this particular service. These deductions reduce the claim to $950, in which sum it is allowed. No interest is allowed for the same reason as heretofore stated.

From Aaron S. Swartz, Jr., Norristown, Pa.